Sally L. **MOODY**, Robert J. Moody, Fred J. Brient, Jr., Cynthia I. Brient, William Duff McCrady, William A. Lucas, A.J. Lucas, Glenn G. Beatty, Sharon L. Beatty, Rodney J. Denardo, Melissa Denardo, Dennis H. Iseman, William R. Eiseman, and Estate of Mary E. Keller, David J. Kushon, and Janie B. Kushon, Appellees

v.

**ALLEGHENY VALLEY LAND TRUST,** Armstrong County Conservancy Charitable Trust, Armstrong Rails To Trails Association, Consolidated Rail Corporation, Jerry F. Longwell, Lee J. Calarie, David R. Ruppert, Norman Karp, and Wilhelminna Decock, Appellants.

Superior Court of Pennsylvania.

Argued Nov. 14, 2006.

Filed June 25, 2007.

Reargument Denied Aug. 28, 2007.

Dennis J. Kusturiss, Pittsburgh, for Karp, appellant.

Colleen P. Kartychark, Corapolis, for Decock, appellant. (no argument)

Donald B. Smith, Pittsburgh, for Lucas, A.J., appellee.

William D. Semins, Pittsburgh, for Rails-To-Trails, Amicus Curiae.

BEFORE: ORIE MELVIN, McCAFFERY, and TAMILIA, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 The present appeal, from an order granting summary judgment, arises from a long-standing dispute concerning whether Consolidated Rail Corporation ("Conrail") had abandoned a railroad right-of-way in Armstrong County (the "County") and, if so, whether the property interest in the right-of-way had reverted to the servient property owners (the Appellees herein). Specifically, we must review whether the trial court correctly determined that Conrail had abandoned the right-of-way under Pennsylvania property law, resulting in a reversion of the property to Appellees, where the evidence shows that Conrail's cessation of rail service thereon coincided with a transfer of the property to a "rails-to-trails" organization, specifically Appellant Allegheny Valley Land Trust ("AVLT"). Because we conclude that such evidence may not support a determination that the property was abandoned under state law, we reverse the trial court's order and remand for further proceedings.[1]

¶ 2 Issues arising from this dispute have been previously reviewed twice by this Court and twice by the United States Court of Appeals for the Third Circuit on appeal from a related action filed in federal district court. We therefore look first to this Court's most recent decision for an initial recounting of the facts and procedural history:

The right-of-way at issue is a portion of what is known as the Allegheny Secondary Track—specifically, the section of track that lies between milepost 30, at S[c]henley, and milepost 63.4, at Redbank, in Armstrong County (the "Rail Corridor"). [Appellees] are owners of eight separate parcels of property contiguous with the Rail Corridor and subject to the right-of-way created [in 1852] for the benefit of Conrail's predecessor-in-interest.

* * *

In 1984, Conrail sought permission from the [Interstate Commerce Commission ("ICC")] (now the Surface Transportation Board ("STB"))[2] to abandon a portion of the Rail Corridor from milepost

---

1. Instantly, we note that the trial court's order granting summary judgment did not dispose of all issues in this case; rather, the trial court's order determined that related ancillary claims raised by Appellees in their complaint would be tried non-jury. However, the trial court timely entered a subsequent order certifying that the order granting summary judgment in favor of Appellees is a *final order* pursuant to Pa.R.A.P. 341(c), based on the court's determination that an immediate appeal would facilitate resolution of the entire case. (Trial Court Order, dated January 27, 2006, at 1). Accordingly, we may review this appeal.

2. The STB assumed all of the functions of the ICC as of January 1, 1996. *See* 49 U.S.C. § 702.

53.8, at Templeton, to 63.4, at Redbank ("Segment 1"). This permission was sought pursuant to Section 308 of the federal Regional Rail Reorganization Act of 1973, 45 U.S.C. § 748 ("RRRA"). By Certificate and Decision dated May 14, 1984, the ICC authorized the abandonment of Segment 1 and required that it be notified after the line was abandoned.... In 1989, Conrail sought permission to abandon the remainder of the Rail Corridor from milepost 30, at S[c]henley, to 53.8, at Templeton ("Segment 2"). By Certificate and Decision dated June 8, 1989, the ICC authorized the abandonment of Segment 2.... The certificate did not require post-abandonment notification to the ICC.

In 1991, Conrail entered into an agreement with [Appellant] Armstrong County Conservancy (the "Conservancy") to convey the Rail Corridor to the Conservancy's nominee, [Appellant] Allegheny Valley Land Trust ("AVLT"). AVLT intended to preserve the Rail Corridor as a "rail trail" and, in early 1992, the Rail Corridor was conveyed to AVLT [by Conrail] by quit claim deed. Around this same time, Conrail entered into other agreements, one turning [over] responsibility for maintaining road crossings and bridges along the Rail Corridor to AVLT, the Conservancy[,] and [the County], and another selling the rails, ties, spikes, etc. to a salvage company. Also about this time, Conrail declined to join AVLT in a petition to the ICC to authorize "rail[-] banking" of the Rail Corridor.[3]

In 1995, [Appellees] filed a complaint in equity against [Appellants] AVLT, the Conservancy, Conrail, Armstrong Rails to Trails Association, and the officers of these organizations, seeking, *inter alia,* to enjoin trespasses on their property and a declaratory judgment that Conrail had abandoned the Rail Corridor and, therefore, that Conrail's property rights in it [had] reverted to them. Preliminary objections were filed by Conrail asserting it had abandoned its interest in the property at issue, and by the non-railroad [Appellants]. The objections were sustained and [Appellees'] complaint was dismissed. On appeal to this Court, we upheld the preliminary objections of Conrail, but reversed those of the remaining [Appellants]. *See Moody v. Allegheny Valley Land Trust* ["*Moody I*"], No. 74 Pittsburgh 1997, unpublished memorandum, 704 A.2d 1127 (Pa.Super. filed Oct. 7, 1997).

*Moody v. Allegheny Valley Land Trust* ("*Moody II*"), No. 766 WDA 2002, unpublished memorandum at 2–4, 839 A.2d 1170 (Pa.Super. filed September 30, 2003) (footnotes in original).[4]

¶ 3 On remand after *Moody I*, the parties filed cross-motions for summary judgment. Appellants obtained initial success with their argument that the trial court lacked subject matter jurisdiction because exclusive jurisdiction lay with the STB. The trial court, based upon a decision filed by the United States District Court for the Western District of Pennsylvania in a related lawsuit, agreed and entered summary judgment for Appellants without de-

---

**3.** "Rail[-] banking" is a federally-authorized method under the National Trail[s] System Act, 16 U.S.C. §§ 1241–51, to preserve a former rail corridor as an interim trail and thereby avoid abandonment and the concomitant reversion of property rights; a rail banked right-of-way remains part of the national rail transportation system and remains

subject to the jurisdiction of the ICC (now the STB). *See generally Lucas v. Township of Bethel,* 319 F.3d 595, 599 & 604 (3d Cir. 2003).

**4.** As a result of our decision in *Moody I,* Conrail was removed as a party to this action.

termining the issue of abandonment. In *Moody II,* this Court reversed. Based upon applicable federal law, the decision of the Third Circuit Court of Appeals reversing the district court case relied upon by the trial court,[5] and our Supreme Court's analysis in a case significantly similar to the one *sub judice,*[6] we held that once the ICC had authorized unconditional abandonment of rail service along the Rail Corridor, the jurisdiction of the ICC and its successor, the STB, terminated. Consequently, we held that the trial court's determination that it lacked subject matter jurisdiction was erroneous. Accordingly, we remanded the case to the trial court to determine the underlying property claims of Appellees. *Moody II, supra,* slip op. at 11.

¶ 4 On remand, the parties filed second cross-motions for summary judgment, wherein they each requested that the court enter judgment in their respective favor on the issue of whether the Rail Corridor had been abandoned under Pennsylvania law. On August 18, 2004, the trial court denied Appellants' second motion for summary judgment. In so doing, the court specifically rejected Appellants' argument that

Appellees had failed to produce any evidence that would establish that Conrail had abandoned the Rail Corridor under Pennsylvania law. The court determined:

> [T]here are disputed questions of material facts in the case which ... would require the issues to be submitted to a jury. These include such matters as Conrail's application for abandonment and the certificate issued by the ICC, the agreement regarding salvage of the tracks and for the dismantlement and removal of facilities and equipment, Conrail's quit claim deed, the Conrail affidavits[,] and the alleged admissions by Conrail officials. While the parties are inclined to place a different spin on these items, they do represent issues that require assessment of credibility issues [sic] and also a determination of what legal inferences, if any, can be drawn from the facts.
>
> In essence[,] the entry of a summary judgment in favor of ALVT would not be free and clear of doubt at this time and would be premature.

(Trial Court Opinion and Order, dated August 18, 2004, at 3; citation omitted).[7]

---

5. *Lucas v. Township of Bethel ("Lucas I"),* 319 F.3d 595 (3d Cir.2003). *Lucas I* was a trespass action filed by some of the Appellees herein against the Township of Bethel, based largely upon the township's removal of ballast along a portion of Segment 2 of the Rail Corridor. Ballast is the coarse stone used to form the bed of a railroad track or road. AVLT had offered the township the opportunity to remove and keep the ballast. The township accepted the offer without any prior knowledge of the pending state lawsuit between Appellees and AVLT. After becoming a defendant in this federal action, the township filed a third-party complaint against AVLT. The Third Circuit Court of Appeals held in *Lucas I* that the ICC's jurisdiction was extinguished once it had unconditionally authorized Conrail's abandonment, and it accordingly remanded the case to the district court to determine the property claims. On re-

mand, the district court entered summary judgment against the Appellee property owners. The Third Circuit Court of Appeals later affirmed, holding that (1) the removal of ballast with Conrail's permission did not violate property rights, and (2) the issue of whether Conrail had abandoned the right-of-way was a matter of state law. *Lucas v. Township of Bethel ("Lucas II"),* 137 Fed.Appx. 450 (3d Cir.2005) (Not Precedential).

6. *Buffalo Township v. Jones,* 571 Pa. 637, 813 A.2d 659 (2002). *See* our discussion *infra* regarding the facts and holding of this salient case.

7. The Commonwealth Court quashed Appellants' subsequent appeal because the trial court had not yet entered a final appealable order pursuant to Pa.R.A.P. 341.

¶ 5 However, on December 30, 2005, the trial court **granted** Appellees' motion for summary judgment on the basis that there was **no issue of material fact** as to Conrail's abandonment of the Rail Corridor and Appellees' ownership of the land by right of reversion. The court held:

[Conrail] abandoned [the] railroad right[-]of[-]way easement between Milepost 30 at Schenley and Milepost 63.4 in Armstrong County on or before June 16, 1989[,] without timely action being taken by any party or entity to petition the [ICC] for rail[-]banking under the National Trails System[ ] Act. The railroad right[-]of[-]way is thus deemed to be extinguished by [Conrail's] abandonment.

\* \* \*

The issue of whether [Conrail] abandoned the railroad right[-]of[-]way has been the subject of acrimonious dispute between the parties over the life of this litigation both from a factual standpoint and a legal standpoint. After much review of the facts which are reasonably not in dispute, the Court concludes that there is no genuine issue of material fact on this issue. [Conrail] intended to abandon the right[-]of[-]way on the basis it was no longer needed for rail service; service was in fact terminated; the property interest was marketed for sale after the abandonment; the track and other items were sold for salvage[;] and a rail[-]banking agreement was refused by [Conrail]. The legal authorities cited by [Appellees] are more persuasive than those put forth by [Appellants], and accordingly the Court deems a summary judgment to be in order.

8. The court further determined that Appellees' remaining issues "relating to injunctive relief, damages for trespass, and libel and slander and disparagement of title[,] and punitive damages" were to be reserved for a

(Trial Court Order, dated December 30, 2005, at 1–2).[8] The date of abandonment as determined by the trial court, June 16, 1989, is the date when the ICC served Conrail with its June 8, 1989 Certificate and Decision granting permission to abandon rail service along Segment 2 of the Rail Corridor.

¶ 6 Appellants filed a timely appeal to this Court and raise the following four issues for our review:

1. Whether the ICC Certificate and Decision granting Conrail permission to abandon its obligation to provide rail service along the Rail Corridor constituted an abandonment of Conrail's property interest in the Rail Corridor?

2. Whether [AVLT] was able to privately Rail Bank the Rail Corridor pursuant to the decision of the Pennsylvania Supreme Court in *Buffalo Township v. Jones?*

3. Whether Interim Trail Designation requires that a rail line be returned to rail use by the same railroad which transferred it to the trail sponsor?

4. Whether [Appellants] have a constitutional right to a jury trial?

(Appellants' Brief at 3).

¶ 7 When reviewing the propriety of an order granting summary judgment,

this Court must determine whether the record (1) establishes that the material facts are undisputed, or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be

*non*-jury trial on the grounds that Appellees' request for equitable relief rendered the "use of a jury ... discretionary" and "advisory only," pursuant to Pa.R.C.P. 1038.3. (Trial Court Order, dated December 30, 2005, at 2).

submitted to the jury. Summary judgment should be entered only in those cases in which it is clear and free from doubt that the moving party is entitled to judgment as a matter of law. Where there is evidence that would allow a jury to find in the non-moving party's favor, summary judgment should be denied and the case should proceed to trial. Our scope of review is plenary, and we apply the same standard of review as the trial court.

*InfoSAGE, Inc. v. Mellon Ventures, L.P.,* 896 A.2d 616, 625 (Pa.Super.2006) (citation omitted). Moreover, for purposes of our review, we view the record in the light most favorable to the non-moving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. *Atlantic States Insurance Co. v. Northeast Networking Systems, Inc.,* 893 A.2d 741, 745 (Pa.Super.2006), appeal denied, 590 Pa. 654, 911 A.2d 932 (2006). Further, credibility of evidence is generally not a proper consideration at the summary judgment stage because the trial court may not summarily enter judgment when the evidence depends on oral testimony. *Gutteridge v. A.P. Green Services, Inc.,* 804 A.2d 643, 652 (Pa.Super.2002). Summary judgment is proper only when the uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. Only when the facts are so clear that reasonable minds cannot differ may a trial court properly enter summary judgment. *Id.* at 651.

¶ 8 Appellants make several arguments with respect to the salient issue of abandonment and reversion. First, Appellants argue that the trial court's determination that Conrail had abandoned the Rail Corridor on June 16, 1989, upon receipt of the ICC's Certificate and Decision granting permission to abandon rail service along Segment 2, is directly contrary to Pennsylvania and federal law holding that the ICC approval of rail-use abandonment is not determinative of abandonment under state property law. Appellants observe that the issue of abandonment under Pennsylvania law requires that multiple other factors be examined. Second, Appellants argue that the trial court's current determination that no issues of material fact exist regarding the issue of state-law abandonment is directly contrary to the trial court's previous determination that summary judgment in favor of Appellants would be inappropriate because there were numerous questions of material fact for a jury to evaluate in determining whether the Rail Corridor had been abandoned, including affidavits and "alleged admissions" of Conrail officials. (Trial Court Opinion and Order, dated August 18, 2004, at 3). Appellants note that Appellees did not supplement the record at any time after the submission of a brief in opposition to Appellants' motion for summary judgment; therefore, there was no change in the factual record that would permit the trial court to now take the contrary view as to whether there are genuine issues of material fact on the issue of abandonment in supporting its grant of Appellees' motion for summary judgment.[9]

¶ 9 Third, Appellants argue that Appellees advanced no evidence to establish the fact of abandonment of the Rail Corridor

---

9. Appellants primarily assert that the factual record supports summary judgment in its favor. In the alternative, Appellants argue that the existence of genuine issues of material fact require that this case be remanded for a jury trial. However, the issue before us is only whether the trial court erred by *granting* summary judgment for *Appellees*.

under state law. Indeed, Appellants argue that a determination that the Rail Corridor was *not* abandoned is mandated by at least two cases: *Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659 (2002), and *Birt v. Surface Transportation Board*, 90 F.3d 580 (D.C.Cir.1996). Further, Appellants argue that our Supreme Court's holding and analysis in *Buffalo Township* controls the disposition of this case and that the trial court's grant of summary judgment to Appellees is directly contrary to *Buffalo Township*. With regard to this argument, Appellants note that our Supreme Court in *Buffalo Township* recognized the strong federal and Pennsylvania legislative policy to preserve railroad rights-of-way by allowing interim recreational use, most notably as articulated in the National Trails System Act ("National Act").[10] Appellants argue that the National Act prohibits a finding of abandonment of a rail corridor where there exists interim trail use allowing for possible future restoration of rail services. Appellants further contend that (1) AVLT, as a qualified entity under state and federal law, filed a valid private declaration of rail-banking for the Rail Corridor, providing for possible future restoration of rail services; (2) except for small sections of the Rail Corridor barricaded by some of the Appellees, the Rail Corridor has been and is being used for valid interim trail use pursuant to AVLT's declaration of rail-banking; and (3) except for small sections of the Rail Corridor barricaded by some of the Appellees, the Rail Corridor is capable of restoration for rail use. Finally, Appellants argue that there is no federal or state requirement that Conrail intends to one day itself resume rail service along the Rail Corridor in order to preserve a validly rail-banked interim trail use on this property; rather, the Rail Corridor need only be rail-banked for potential use by any eligible railroad company. In this case, Conrail had indicated that it has no present interest in resuming operations along the Rail Corridor.

¶ 10 In response, Appellees argue that the trial court correctly entered summary judgment in their favor because (1) Conrail expressly refused to take any action to rail-bank the Rail Corridor, which, according to Appellees, is dispositive of the issue of whether Conrail abandoned the Rail Corridor; (2) Conrail conveyed all interest in the Rail Corridor by quitclaim deed to AVLT, retaining no future interest and expressly refusing any obligation to ever resume rail service along the Rail Corridor; (3) Conrail had applied to the ICC, at least regarding Segment 2, for unconditional abandonment of service; (4) Conrail did not enter into a rail-banking agreement or an interim trail agreement with AVLT as purportedly required by the National Act; (5) Conrail "testified" that it had "consummated abandonment" of the Rail Corridor;[11] (6) Conrail had marketed the Rail Corridor with the express understanding that it intended to divest itself of any future interest in it, including any obligation to provide future rail service; (7) Appellants do not include a municipality among their number and, therefore, are purportedly disqualified from sponsoring a trail along a railway corridor under state statutory law; (8) Conrail's ICC application, its application to the Public Utility Commission ("PUC") to abandon all crossings along the Rail Corridor, and its sale of rails and other property along the Rail Corridor to a salvage company signified its intent to abandon the Rail Corridor; and (9) the railway right-of-way along the Rail Corridor was an easement for railroad purposes only and thus was extinguished

---

10. 16 U.S.C. § 1241–51.

11. (Appellees' Brief at 8).

when Conrail abandoned all rail usage on the property. Appellees also argue that even if the trial court erred by determining that the date of abandonment was the date the ICC delivered its June 8, 1989 Certificate and Decision granting permission to abandon rail service along Segment 2 of the Rail Corridor, such error was harmless as the facts in total purportedly establish indicia of abandonment. Appellees further argue that the facts of *Buffalo Township* are critically different from the facts herein, and that the trial court, in light of *Moody II* and *Lucas I*, was bound by principles of "res judicata, collateral estoppel, and the doctrine of 'law of the case'" in arriving at its determination. (Appellees' Brief at 13–14, 55–57).

¶ 11 As can be discerned from the above summary of the arguments, as well as from a more extensive review of the briefs, the parties have presented well-developed and impassioned positions wherein state and federal statutory and case law are parsed with creditable skill. However, whatever the intricacies and complexity of the presented arguments may be, the central issue of this case is rather basic: can there be an abandonment of a railroad right-of-way under Pennsylvania law when the railroad transfers its interest to a rails-to-trials organization contemporaneously with its cessation of service and relinquishment of all right, title, and interest in the right-of-way? We note that the record shows that the Rail Corridor was established *in 1852,* and that predecessor railroad companies have owned and transferred their interest in the right-of-way since the Rail Corridor's creation. Here, instead of transferring the Rail Corridor to another railroad company, Conrail transferred it to AVLT, an organization dedicated to the preservation of the Rail Corridor

for possible future rail use while maintaining the corridor as an interim trail under the National Act. Had Conrail transferred the Rail Corridor to another railroad company, presumably there would have been, absent unusual circumstances, no contention that the right-of-way had been abandoned. Thus, the question is whether there can be a distinction between selling the corridor to a railroad company or to a rails-to-trails organization for purposes of Pennsylvania law of abandonment and reversion. As Appellants correctly observe, our Supreme Court's holding in *Buffalo Township, supra* establishes that a railroad's transfer of a railroad right-of-way to a qualified entity dedicated to preserving the right-of-way under the National Act prohibits a reversion of the property to the servient land owners.

¶ 12 In *Buffalo Township,* the high court affirmed a decision granting the township's request to enjoin landowners from blocking, obstructing, or intimidating maintainers or users of a trail once used by Conrail as a railroad right-of-way.[12] In *Buffalo Township,* as in the case *sub judice,* Conrail had filed an application with the ICC to abandon rail service along the right-of-way, which was granted. Conrail then sold its rails and ties along the right-of-way to a salvage company. Thereafter, Conrail and the township filed a request for interim trail use with the ICC pursuant to that agency's regulations, but later *withdrew* this request. After such request was withdrawn, Conrail conveyed the railroad right-of-way to the township by quitclaim deed. In the deed, Conrail reserved the right to re-enter the property.

¶ 13 Thereafter, the township began to develop the right-of-way as a recreational trail pursuant to the National Act and the

---

**12.** In fact, the rail corridor at issue in *Buffalo Township* extended from Armstrong County into neighboring Butler County, wherein Buffalo Township lies.

Pennsylvania Rails to Trails Act ("State Act"), 32 P.S. §§ 5611–22. Property owners adjoining the trail asserted that Conrail had abandoned the right-of-way and consequently the land had reverted to them. In furtherance of their claim, the property owners erected barriers to prevent the right-of-way from being used as an interim recreational trail.[13]

¶ 14 The Supreme Court addressed the issues in *Buffalo Township* with a two-pronged analysis. First, the Court reviewed whether the evidence supported the trial court's determination that Conrail had not abandoned the right-of-way under Pennsylvania law.[14] As the Court noted, "[q]uestions of abandonment *are heavily fact-driven decisions.*" *Buffalo Township* at 647 n. 7, 813 A.2d at 665 n. 7 (emphasis added). The reason that these decisions are heavily fact-driven is that *intent* to abandon must be established from the evidence, and that numerous possible factors

evidencing intent must be considered. *Id.* at 646–47, 813 A.2d at 664–65. With respect to matters pertaining to an evaluation of whether a railroad had abandoned a railroad right-of-way, the Court observed:

> In order to establish the abandonment of a right-of-way, the evidence must show that the easement holder intended to give up its right to use the easement permanently. Such conduct must consist of some *affirmative act* on his part which renders use of the easement impossible, or of some *physical obstruction* of it by him in a manner that is inconsistent with its further enjoyment. Mere nonuse by the railroad does not amount to abandonment.

> In determining the intent of the parties, the intermediate courts have considered a myriad of factors. For example, ... a mere failure to maintain and repair existing tracks did not amount to an intent to abandon. [Further, it has been] held

13. In the case *sub judice*, several of the Appellees have likewise erected barriers or posted signs along the Rail Corridor. Indeed, except for the procedural posture, the similarity between the case *sub judice* and *Buffalo Township* is fully apparent by the stark similarities in the arguments of the respective parties. The relevant arguments of the parties in *Buffalo Township*, many of which closely parallel those in the case *sub judice*, are as follows:

> Appellants [the servient property owners] argue that Conrail abandoned the right-of-way prior to the transfer of the property to Buffalo Township via a quitclaim deed. According to Appellants, Conrail abandoned the property either when it filed a certificate of abandonment with the ICC or when it authorized salvage of the railroad tracks. Thus, Conrail had abandoned its interest in the property prior to the time it transferred its "interest." Alternatively, upon transfer of the property, Conrail abandoned the property since its interest in the property was limited solely to railroad purposes. Further, Appellants maintain that the lower courts improperly relied upon the National Act in determining that the property was

not abandoned, since Conrail and Buffalo Township did not comply with the requirements of the National Act, and thus, that Act cannot preserve the transfer of the property to Buffalo Township. Accordingly, Appellants conclude that the property reverted to them under common law and the lower courts erred in granting the injunction in favor of Buffalo Township.... Buffalo Township responds that the land was not abandoned at the time of the quitclaim deed, [and] thus Conrail properly transferred its interest in the property. Further, the National Act and the State Act allows the transfer of the property. Alternatively, Buffalo Township offers that case law from Pennsylvania allows a railroad company to transfer the land to further a public use or purpose.

*Buffalo Township, supra* at 643–44, 813 A.2d at 663.

14. In contrast to the procedural posture in the case *sub judice*, wherein summary judgment was entered after a determination that no genuine issues of material fact existed, in *Buffalo Township* the case was decided *after* an evidentiary hearing held by the trial court.

that evidence that the railroad company entered into salvage agreements and quitclaimed its interest in the subject property *should be submitted for the factfinder to resolve the railroad's intent to abandon.* Courts in this Commonwealth have also indicated that the filing of a certificate of abandonment with the ICC or PUC demonstrated intent to abandon, but cautioned that in order to justify a finding of abandonment, the filing of the certificate *must be coupled with external acts in furtherance of abandonment.*

In sum, many different factors can be considered when making a determination of abandonment. Moreover, no single factor alone is sufficient to establish the intent to abandon. Abandonment must be determined based upon all of the circumstances surrounding the alleged abandonment.

*Id.* at 646–47, 813 A.2d at 664–65 (quotation and citations omitted; bold emphasis supplied).

¶ 15 In applying these principles, the Court noted that the record in *Buffalo Township* showed indicia of both intent to abandon and the contrary. The Court noted that Conrail's act of filing a request to abandon rail service with the ICC and entering an agreement with a firm to salvage its rails indicated intent to abandon.[15] However, the Court further noted that Conrail's *negotiations with the township for use of the land* and its express retention of a right to re-enter the land for future railroad use in the deed militated against the conclusion that Conrail had abandoned the property and thus supported the equity court's determination

that Conrail had not abandoned the railroad right-of-way in Butler County. *Id.* at 647–48, 813 A.2d at 665–66.

¶ 16 The second prong of the Court's analysis in *Buffalo Township* addressed the property owners' argument that a railroad company's transfer of a railroad right-of-way to a *non-railroad* entity triggered a reversion of the right-of-way to the servient property owners. In so doing, the Court further addressed the more specific contention, also raised by Appellees in the case *sub judice,* that formal ICC (now STB) authorization was necessary to transfer a railroad right-of-way for non-railroad purposes. To address these issues, the Court first reviewed relevant legislation: specifically, the National Act and the State Act, and the seminal United States Supreme Court case of *Preseault v. Interstate Commerce Commission,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).

In *Preseault* ..., the Court was faced with a challenge to the constitutionality of the National Act under the Takings Clause of the United States Constitution. By way of background, the Court first traced the history of the National Act. The Court explained that Congress was motivated to preserve the loss of railroad lines across the United States and enacted the Railroad Revitalization and Reform Act (hereafter "Reform Act") in 1976. The Reform Act encouraged the conversion of railroad tracks to recreational trails. However, the Reform Act was unsuccessful in furthering this purpose and in response thereto, in 1983, Congress enacted amendments to the previously enacted National Act, in-

---

**15.** *But see Birt, supra,* 90 F.3d at 585–86 (noting that although a railroad company's cessation of operations, cancellation of tariffs, salvage of tracks and other equipment, and relinquishment of control over the right-of-way *may* indicate an intent to abandon, these factors *are equally consistent with* a temporary cessation, or discontinuance of operations that would permit a rails-to-trails conversion, and thus would not be indicia of abandonment).

cluding the addition of subsection (d) to [Section] 1247 of the National Act. This subsection sought to "preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." 16 U.S.C. § 1247(d). In order to accomplish this purpose, the subsection provided that:

> in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247(d). Thus, the effect of this subsection was to deem certain interim trail use a "discontinuance" as opposed to an "abandonment," which had the effect of preventing "property interests from reverting under state law." *Preseault*, 494 U.S. at 8, 110 S.Ct. 914.... Ultimately, the Court held this provision constitutional.

Pennsylvania, following the federal lead, enacted the State Act, effective ninety days after December 18, 1990. 32 P.S. § 5611. This legislation gave the Department of Environmental Resources the authority to participate in rails to trails conversions for the purpose of developing "available railroad rights-of-way for public recreational use." 32 P.S. § 5613. The State Act also gave counties or municipalities the right to "accept title to available railroad rights-of-way conveyed by quitclaim deed or warranty deed." 32 P.S. § 5614(c)(2). Both the National Act and the State Act display a strong legislative policy

encouraging the preservation of railroad rights-of-way by using existing rights-of-way for interim recreational trail use. The National Act accomplishes this directly by providing that "interim trail use" is a "discontinuance" rather than an "abandonment" of the prior railroad use, thus preventing the right-of-way from reverting under state law. *Preseault*. The State Act demonstrates its intent by giving counties and municipalities the right to accept title to the railroad rights-of-way. The inescapable effect of these Acts is to allow a railroad company to transfer its possessory interest in the land, *i.e.*, the right-of-way, *to a third party* for the limited purpose of interim recreational trail use. The interim trail user essentially holds the railroad company's land in trust until the railroad needs to reactivate service on the rail line. In this way, the legislature has effectively prevented the further loss of railroad track. *See Preseault supra*. Thus, upon the conversion of a railroad line to a recreational trail, the railroad's right-of-way does not terminate but is held in abeyance, *and thus, the land does not revert to the property owner*.

*Buffalo Township* at 648–50, 813 A.2d at 666–67 (footnotes and some citations omitted; emphasis added).

¶ 17 With this background in mind, the *Buffalo Township* Court flatly rejected the property owners' argument that a railroad right-of-way could only be preserved as an interim trail under the National Act through formal ICC (now STB) authorization. In so holding, the Court noted (1) there was no statutory language in the National Act imposing an obligation on a trail organization to file for interim trail authorization with the ICC; (2) in at least one ICC decision, the ICC determined that a railroad right-of-way can be preserved

without ICC authorization; (3) the ICC had consistently taken the position that its function regarding the regulation of interim trail use agreements is wholly ministerial; and (4) federal court decisions have reinforced the conclusion that the ICC or STB's function with regard to trail conversions is simply "perfunctory." *Id.* at 651–54, 813 A.2d at 667–70. Our Supreme Court therefore concluded that "a railroad right-of-way can be converted to a recreational trail where there is a failure to file an application with the ICC, so long as the proposed trail user complies with the requirements of section 1247(d) [of the National Act]." *Id.* at 654, 813 A.2d at 670. The Court further held that because there was no requirement under the National Act to pursue trails conversion only by means of the regulations of the purely ministerial ICC or STB, and because Buffalo Township had met the requirements of Section 1247(d) of the National Act by agreeing to take all financial, legal, and managerial responsibility for the trail and allow the reactivation of rail service on the trail when required, the township's withdrawal of its ICC application for trail conversion *was of no moment.* *Id.* at 654–55, 813 A.2d at 670.

■ ¶ 18 Based upon the Court's holding and analysis in *Buffalo Township,* it is abundantly clear that in the case *sub judice,* the trial court erred by entering summary judgment in favor of Appellees. Of significance is the undisputed fact that Conrail's activities in shutting down its rail service along the Rail Corridor coincided with and were part and parcel of its negotiation with and sale of the corridor to the Conservancy and the subsequent delivery of a deed to AVLT. Thus, there was no significant gap in time between Conrail's cessation of its rail service and the conveyance of the Rail Corridor to AVLT. Although, as our Supreme Court observed in

*Buffalo Township,* certain acts of Conrail's might be interpreted by a fact-finder as indicia of intent to abandon, such as its applications for unconditional abandonment of rail service with the ICC, other factors counter the conclusion that Conrail intended to abandon the Rail Corridor. Chief among these is Conrail's contemporaneous negotiation of the sale and transfer of the Rail Corridor to another entity. Indeed, in *Birt, supra,* 90 F.3d at 586, the United States Court of Appeals for the District of Columbia observed that a railroad company's willingness to enter into negotiations regarding trail conversion under the National Act "is *inconsistent* with an intent to consummate abandonment." (Emphasis added). The *Birt* Court further noted quite cogently that although a railroad company's cessation of operations, cancellation of tariffs, salvage of tracks and other equipment, and relinquishment of control over the right-of-way *may* indicate an intent to abandon, these factors *are equally consistent with* a temporary cessation, or discontinuance of operations that would permit a rails-to-trails conversion, and thus *would not* be indicia of abandonment. *Id.* at 585–86. In the instant case, Conrail did not simply cease its service, salvage its rails and equipment, and walk away. It sold the property. Further, Conrail entered into a contemporaneous agreement whereby the County, the Conservancy, and AVLT agreed to assume all duties to maintain all road crossings and bridges along the Rail Corridor. In light of these facts, we determine it was error for the trial court to conclude that Conrail had abandoned the property.

¶ 19 Of *equal* significance is the fact that Conrail transferred the property to an organization intending to preserve the Rail Corridor for interim trail and future rail use pursuant to the National Act. As the Court in *Buffalo Township* held, a railroad company's transfer of a railroad right-of-

way to a trail organization pursuant to the intent of the National Act preempts a reversion of the right-of-way to the servient property owners. Thus, Conrail's transfer of the Rail Corridor, essentially contemporaneously with its cessation of rail service, to an organization intending to preserve the Rail Corridor for interim trail and future rail use pursuant to the National Act, establishes that the servient landowners seeking a right of reversion are not entitled to judgment as a matter of law.[16]

¶ 20 Because we are reviewing an appeal from a grant of summary judgment in favor of Appellees, we must view the record in the light most favorable to Appellants as the non-moving party. Thus, in addition to the previously-stated facts, we take note of the following. After its receipt of the 1989 ICC certificate authorizing an abandonment of rail service along Segment 2 of the Rail Corridor, Conrail marketed the property for sale and entered into negotiations with AVLT, which was seeking to convert the corridor into recreational trails while preserving the road beds for future railroad use. Conrail *was aware* of AVLT's intentions for the Rail Corridor and of the involvement of the County and the Conservancy in this project. Indeed, Conrail entered into a bridge maintenance agreement turning over responsibility for maintaining road crossings and bridges along the Rail Corridor to the County, the Conservancy, and AVLT.

¶ 21 On July 11, 1991, Conrail entered into a conditional agreement with the Conservancy (or its nominee) to sell the Rail Corridor *for $250,000.* On January 7, 1992, Conrail conveyed the Rail Corridor

to AVLT by quitclaim deed. The conditional sales agreement and quitclaim deed each provided that none of the parties to these matters contemplated that Conrail would in the future operate rail service on the Rail Corridor, absent a separate agreement setting forth agreed-upon terms and conditions. However, *neither the sales agreement nor the deed set forth any provision or condition that the Rail Corridor could not be used for rail service, and Conrail never intended to "preclude, restrict or limit the right of AVLT or any third party to reinstate rail service on the Rail Corridor at any time in the future."* (Affidavit of James A. Ahonen, Conrail Real Estate Department ("Ahonen Affidavit"), filed July 18, 2001, at 4) (emphasis added). Moreover, in response to Appellees' requests for admissions, Conrail averred that it did not intend during any of the relevant proceedings to abandon the Rail Corridor for future rail service or that the Rail Corridor not be retained for future rail service.

¶ 22 When AVLT filed its deed to the Rail Corridor on January 9, 1992, it also filed as an attachment to the deed a "Declaration of Railbanking," which stated in relevant part:

> [AVLT], ... Grantee in the attached Deed from [Conrail], pursuant to the provisions of the [National Act] and regulations promulgated thereunder, does by acceptance of this Deed declare that the following established railroad lines, rights-of-way and easements which are conveyed by this Deed [including the Rail Corridor] are preserved as an interim recreational use trail and are railbanked for future rail service, related

---

**16.** We also note that Congress, through the RRRA, expressed its intent to favor the purchase and preservation of Conrail's financially-stressed rail lines by *various* entities, including non-railroad entities in addition to

rails-to-trails organizations. *See Quarry Office Park Associates v. Philadelphia Electric Co.,* 394 Pa.Super. 426, 576 A.2d 358, 365 (1990).

transportation purposes, or other uses as provided for by the [National Act.]

\* \* \*

[AVLT] further declares that the trail[-]related structures, such as bridges and culverts, have considerable value for trail use or for future transportation purposes, and such will be preserved.

(Declaration of Railbanking filed in Armstrong County with Indenture, dated January 7, 1992, at Book 1160, Page 0187).

¶ 23 Prior to its conveyance of the Rail Corridor, but well after its receipt of the ICC authorizations to abandon rail service, Conrail refused AVLT's request to join in a petition to the ICC to have that body authorize rail-banking of the corridor. However, Ahonen averred: "Conrail, on advice of its counsel[,] did not want to become involved in proceedings to have the Rail Corridor designated for interim trail use due to the passage of time from the issuance of the ICC Certificates and Decisions." (Ahonen Affidavit at 3–4). David R. Rupert, Director of AVLT, averred that Conrail had "informed AVLT that it would not apply to the ICC to retroactively rail[-]bank the Rail Corridor as an interim trail since there were no established procedures for retroactive rail[-]banking and it did not wish to become involved in establishing such procedures." (Affidavit of David R. Rupert, filed July 18, 2001, at 3).

¶ 24 When Conrail conveyed the Rail Corridor, it reserved the right to separately market and come upon the property for two additional years to sell the rails, ties, switches, signals, and other track materi-

als. Conrail sold its rails, ties, switches, signals, and other track materials to a salvage company in December 1992. In April 1992, Conrail applied to the PUC to be relieved from any responsibility for maintaining road crossings along the Rail Corridor. The PUC granted Conrail's application and then *reassigned* responsibility for the crossings jointly to AVLT, the Conservancy, and the county.

¶ 25 From the time AVLT acquired the Rail Corridor, it has acted to maintain the corridor for future rail use by removing downed trees, weeds, or other debris and by repairing, replacing, maintaining, or improving bridges and culverts. Since approximately 2000, AVLT has been in negotiations with Rosebud Mining Company to reinstate rail service to haul coal along nine miles of the Rail Corridor. Under AVLT's ownership, the Rail Corridor has been used as a recreational trail and has been preserved for future rail use, except for those portions of the corridor barricaded by some of the Appellees.

■ ¶ 26 Consideration of this additional evidence establishes that Appellants have demonstrated, for purposes of summary judgment review, that Conrail conveyed the Rail Corridor to AVLT with the knowledge that the corridor would be preserved for future rail and interim trail use pursuant to the National Act. Indeed, Conrail's application to the PUC to be relieved from its obligation to maintain road crossings along the Rail Corridor was made in part on the strength of the agreement that responsibility for maintenance of the crossings would fall jointly to AVLT, the Conservancy, and the county.[17] Therefore, the evidence shows that Conrail

---

17. Further, "[a] PUC certificate granting permission to abandon railway crossings is not dispositive of whether or not a railroad has abandoned a right[-]of[-]way, as the certificate, without more, does not constitute abandonment." *Thompson v. Maryland & Pennsylvania Railroad Preservation Society,* 417 Pa.Super. 216, 612 A.2d 450, 455 (1992). *See also Condemnation by the County of Lancaster,* 909 A.2d 913, 916 (Pa.Cmwlth.2006).

never intended that the Rail Corridor would forever be abandoned for rail service. Rather, Conrail merely showed an intent that *it* would no longer use the Rail Corridor. For these reasons, and in light of the guidance set forth by our Supreme Court in *Buffalo Township*, we conclude that the trial court erred by entering summary judgment in favor of Appellees based on the faulty conclusion that the undisputed evidence established that Conrail had abandoned the Rail Corridor under principles of Pennsylvania law.

¶ 27 Appellees argue that the trial court's order must be upheld on the basis of several arguments. We reject these, noting that Appellees largely (and incorrectly) focus upon (1) actions taken by Conrail that *could,* but not necessarily must, be interpreted as indicia of abandonment of the Rail Corridor; (2) Conrail's failure to seek authorization to rail-bank under ICC regulations; and (3) certain insignificant distinctions between the case *sub judice* and *Buffalo Township*. Appellees ignore the critical fact that Conrail simply transferred the Rail Corridor to a rails-to-trails organization contemporaneously with its cessation of rail service, which fact **prohibits** the conclusion that the Rail Corridor had been abandoned under Pennsylvania law pursuant to *Buffalo Township*.[18]

¶ 28 Appellees contend that this Court's statement in *Moody I, supra,* that Conrail had abandoned "all past, present, and future interest in the land at issue," is dispositive. *Moody I, supra,* slip op. at 4. However, a plain reading of *Moody I* precludes the conclusion that this Court ruled therein on the critical matter of whether Conrail had abandoned the Rail Corridor under Pennsylvania law.[19] Rather, this Court simply determined that Appellees' second amended complaint was defective as against Conrail. This Court further noted that Conrail had disavowed any present or future interest in the Rail Corridor. *Moody I, supra,* slip op. at 5–7. However, as previously ·discussed, a railroad company's transfer of a railroad right-of-way, and its concomitant divestiture of present and future interest in the land, to a qualified entity under the National Act does not constitute an abandonment of the right-of-way.

¶ 29 Appellees also argue that rail-banking may only be accomplished through federal regulations and that Conrail's refusal to join AVLT in an application to rail bank is dispositive. Appellees contend that a host of federal cases construing ICC regulations regarding rail-banking pursuant to the National Act es-

---

18. We also note that Appellees have completely misapprehended our standard of review. Appellees assert that our standard of review is limited to whether a judicial mind, on due consideration of all of the evidence as a whole, could have reasonably reached the conclusion of the tribunal. (Appellees' Brief at 1). This is not the standard of review applicable to an appeal from the grant of summary judgment; rather, it is the standard applicable to an appeal from a final decree in equity following adjudication. *See Buffalo Township, supra* at 647 n. 7, 813 A.2d at 665 n. 7. However, no adjudication of the facts took place in this matter. Notwithstanding, Appellees argue, for example, that the facts "indicate" an intent by Conrail to abandon

the Rail Corridor and that certain facts "could be interpreted" as an act of abandonment, *or,* at the same time could "be interpreted as indicia of intent *not to abandon."* (Appellees' Brief at 43, 44; *see also id.* at 41). By making these observations, Appellees unwittingly concede, at the very least, that there are genuine issues of material fact requiring evaluation by a fact-finder.

19. Appellees make a similar, and similarly unavailing, argument regarding whether *Lucas I* prohibits a review of Appellants' arguments on grounds of *"res judicata"* or "law of the case."

tablish that a railroad company must voluntarily acquiesce to the creation of an interim trail. Appellees then argue that Conrail's refusal in this case to join AVLT's application to the ICC for an authorization of rail-banking shows that Conrail did not voluntarily agree to the creation of an interim trail along the Rail Corridor. We disagree.

¶ 30 The cases upon which Appellees rely do not hold that a railroad company *must* apply to the ICC for rail-banking in order to create an interim trail, or that there must be an independent agreement between the railroad company and the rails-to-trails organization to permit rail-banking; rather, they hold that a railroad company may not be *compelled* to sell or transfer a railroad right-of-way to a rails-to-trails organization.[20] Our Supreme Court in *Buffalo Township* analyzed several of the cases relied upon by Appellees herein to conclude that the ICC's (now STB's) role with regard to trail conversion is simply *ministerial*. *Buffalo Township, supra* at 651–54, 813 A.2d at 667–70. After its analysis, the Court concluded that "a railroad right-of-way can be converted to a recreational trail *where there is a failure to file an application with the ICC,* so long as the proposed trail user complies with the requirements of section 1247(d) [of the National Act]." *Id.* at 654, 813 A.2d at 670 (emphasis added).[21]

¶ 31 Section 1247(d) of the National Act provides:

(d) Interim use of railroad rights-of-way The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976, shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs.

Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, *or qualified private organization* is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all

---

20. *See, e.g., Goos v. Interstate Commerce Commission,* 911 F.2d 1283 (8th Cir.1990); *National Wildlife Federation v. Interstate Commerce Commission,* 850 F.2d 694 (D.C.Cir. 1988).

21. Our Supreme Court further observed and held:

The language in the statute referring to "terms and conditions," 16 U.S.C. § 1247(d), merely relates to the managerial, financial, and legal responsibility of the trail user and clarifies the obligations that

the interim trail user must fulfill in order for the trail conversion to occur. However, this language does not impose any filing obligation on the trail user; rather, any requirement of formal ICC intervention is merely by implication. We refrain from reading such a requirement into the statute where the language of the statute itself does not make such a requirement mandatory for trail conversion.

*Buffalo Township, supra* at 651–52, 813 A.2d at 668.

taxes that may be levied or assessed against such rights-of-way, then the [STB] shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

16 U.S.C. § 1247(d) (emphasis added). Here, the evidence viewed in a light most favorable to Appellants shows that AVLT is a qualified private organization prepared to assume full responsibility for the management of the Rail Corridor along with legal liability for its use. Thus, AVLT has met the necessary federal requirements to rail-bank the Rail Corridor, and, as our Supreme Court held in *Buffalo Township,* no approval from the ICC or STB was necessary to accomplish the trail conversion. Further, nothing in the National Act requires a formal agreement setting forth a railroad company's consent to trail conversion, and such consent may be evidenced by an agreement conveying the right-of-way to a qualified trails organization. Thus, contrary to Appellees' arguments, AVLT was not precluded from acquiring ownership of the Rail Corridor in furtherance of the National Act's salutary purposes or from declaring that the property was "rail-banked" in accordance with the provisions and purposes of the National Act.[22]

¶ 32 Further, Appellees' argument concerning the significance of Conrail's failure to join AVLT in a petition to the ICC for rail bank approval fails in light of *Moody II* and *Lucas I,* wherein this Court and the

Third Circuit Court of Appeals, respectively, held that the ICC had lost its jurisdiction over any matter pertaining to trail conversion along the Rail Corridor once it issued its final decision in 1989 authorizing Conrail's abandonment of service along Segment 2 of the Rail Corridor. Once the ICC lost its jurisdiction, it was of no moment that Conrail later refused to join AVLT in a petition to that agency. *See also Buffalo Township, supra* at 654–55, 813 A.2d at 670.

■ ¶ 33 Appellees argue extensively that the evidence indicates Conrail's intent to abandon the Rail Corridor. In part, Appellees base their argument on distinctions between the facts of the case *sub judice* and the facts of *Buffalo Township,* wherein the Court determined that the evidence supported the trial court's conclusion that the property at issue in that case had not been abandoned. Appellees note that in *Buffalo Township,* Conrail expressly provided for a right to reenter the conveyed property and that Conrail had joined the township in its application to the ICC for rail-banking approval under that agency's regulations. However, our discussion *supra* indicates that these factual distinctions are of no consequence. The salient fact of record is that Conrail, contemporaneously with its activities regarding its cessation of service, transferred the Rail Corridor to a qualified organization prepared to assume full responsibility for the management and maintenance of the corridor pursuant to the National Act. *Buffalo Township* establishes that abandonment under Pennsylvania law may not

---

**22.** Also, Appellees' assertion that Conrail did not voluntarily agree to a trail conversion is wholly undercut by the evidence that Conrail voluntarily sold the Rail Corridor to the Conservancy with knowledge that the property would be used as an interim trail under the

National Act, together with the evidence that Conrail entered an agreement with the County, the Conservancy, and AVLT in which the latter parties agreed to be responsible for all maintenance of the crossings and bridges.

be found under such circumstances.[23] There is no requirement under the National Act that the railroad company conveying a railroad right-of-way to a trails organization reserve the right to resume *its own* service at some future time. Indeed, such a requirement would make little sense in light of the express purposes of Section 1247(d) of the National Act, and the general purposes evinced by the RRRA and subsequent reform legislation.

■ ¶ 34 Appellees also argue that the 19th century legislation upon which the Rail Corridor was purportedly established allowed for a possession of property for purposes of creating a right-of-way for railroad purposes only.[24] Appellees, however, make no effort to explain why the National Act, or indeed the State Act, does not preempt and supersede this legislation.

¶ 35 Finally, Appellees argue that AVLT does not qualify as an entity capable of sponsoring a trail under the State Act because, unlike the entity in *Buffalo Township*, it is not a municipality. The State Act authorizes the Pennsylvania Department of Environmental Resources ("DER") to acquire available railroad rights-of-way for public recreational trial use. 32 P.S. §§ 5613–5614. For purposes of the program *established by the State Act,* the DER, counties, or municipalities "may" accept title to "available" railroad rights-of-way and abutting property. 32 P.S. § 5614(c). However, nothing in the State Act indicates that it is to apply to all Pennsylvania railroad rights-of-way converted to trails under the National Act. Rather, the State Act simply provides authorization and a mechanism to acquire railroad rights-of-way by certain government entities.[25] Indeed, the State Act fully contemplates that there will be *private* owners of railroad rights-of-way. *See* 32 P.S. § 5621. Moreover, we note, that in the case *sub judice* the County, jointly with the Conservancy and AVLT, has assumed responsibility for all crossings and bridges along the Rail Corridor.

¶ 36 Having determined that (1) the trial court erred in its ruling that Conrail had abandoned the Rail Corridor in light of the allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits viewed in a manner most favorable to Appellants; (2) the trial court misapplied the holding of *Buffalo Township, supra;* and (3) the arguments advanced by Appellees have no merit, we conclude that the trial court erred by entering summary judgment for Appellees herein. Accordingly, we reverse the order of the trial court and remand this matter for further proceedings.[26]

---

**23.** We further note that in the case *sub judice,* Conrail expressly reserved the right under the conditional agreement of sale to reenter the Rail Corridor for a period of two years to salvage its rails, ties, and other equipment thereon.

**24.** *See* Act No. 105, April 4, 1837, Section 6, Session of 1836–37.

**25.** Significantly, the State Act does not make mention of the salient intent voiced in the National Act of preserving rail corridors for future rail use, nor does it indicate that trails are to be acquired pursuant only to ICC or STB regulations.

**26.** Because of our disposition, we decline to address Appellants' final issue, which pertains to whether the trial court erred in its determination that Appellees' then-remaining, ancillary causes of action would be tried by the court, not a jury. Appellees' additional causes of action are inextricably linked with the central matter of whether the Rail Corridor had been abandoned. As we are reversing the trial court's resolution of this central issue, it would be speculative to opine concerning Appellants' right to a jury trial on fewer than all of the issues that will be before the court on remand.

¶ 37 Order reversed. Case remanded. Jurisdiction relinquished.